And the first is number 17-2200. In Re Hertz Global Holdings Inc. Mr. Willans, Mr. Yudakovsky, and Mr. Markel. Whenever you're ready. Good morning. May it please the court. My name is Doug Willans and I represent the plaintiffs below. Two pension funds who represent a group or a class of investors of Hertz, which is a well-known car and equipment rental company. With the court's permission, I'd like to request three minutes for rebuttal. That's fine. The district court erred here in dismissing the operative complaint, but concluding that the plaintiffs failed to plead a strong inference of scienter as required by the PSLRA. And what was the strong inference that you point to in your complaint? Well, I guess there's several. Inferences, I should say. I'm sorry? If you want to do plural inferences, what were they? Well, I'd actually like to start at the end with the issue of corporate scienter. And the reason I want to do that is because it really highlights what the district court missed here with respect to the underlying issue. Starting with that, does that affect an admission that you don't have enough to go with regular scienter? No. That's a doctrine that seems to be one that courts have gone to if you can't cobble together actual scienter by individuals. I don't think it suggests any weakness at all. What I wanted to highlight through that argument is that what the district court missed here is that there was an actual accounting fraud that took place. And how do we know that an accounting fraud took place? Because they spelled it out in the restatement. When they discussed inappropriate accounting decisions that were made and inappropriate changes in methodology. Is there a difference between fraud and error? Certainly. Okay. If there's a difference between fraud and error, is it based on what you've alleged, is it actually strongly to the effective exclusion of more plausible inferences in the complaint that what we're dealing with here at a corporate level, taking your basis to start with, at a corporate level, is fraud and not errors that were corrected? Well, I think with respect to the corporate level and the underlying accounting fraud that took place, you're definitely dealing with fraud here. Because what you're dealing with, you're dealing with accounting manipulations. And if you look at, and I'll direct the court to page 73 of our complaint, it goes through and it borrows from the restatement and it talks about very specifically the types of manipulations that occurred here. Now, jumping ahead with respect to the individual defendants, the district court here drew inferences from the facts in the complaint solely in terms of mismanagement. But what we allege here is that recklessness. And we're saying that the defendant's actions represented such an extreme departure from the standard of care. Right, and that seems, I certainly understand that that's your allegation. What I understand the district courts have done, a very careful opinion, is to look at the evidence and say, not necessarily that you've got no basis to argue the inferences you've argued, but that there is at least as plausible, indeed more plausible, inference to be drawn. And it's not one of fraud. It's one of mismanagement, not deliberate fraud. It's one of error because of a bad tone at the top, but not of fraud. Now, under the PSLRA, what is wrong with the district court looking at the evidence and saying, I think that inference is the better inference on the record? Well, I think when you're talking about balances, first you still have to adhere to Rule 12b-6. You still have to take the facts and the complaint is true, and in the first instance, draw inferences in favor of us. Now, with respect to... Wait a second. Wait, wait, wait. When you say you have to draw inferences in favor of us, what does the PSLRA require in terms of a changed pleading standard? Doesn't it actually change the pleading standard? Well, it says what the PSLRA does and what the Supreme Court said in tele-abs is that there is a comparative analysis with respect to CANTRA allegations. Okay, if that's true, how can it be the case that we're obligated to draw every inference in your favor, if, on the other hand, we're also told you have to weigh and compare? Well, I think the Supreme Court very clearly says that you have to draw... We're still here on a pleading standard. We're still under 12b-6. You look at the allegations in the complaint, just as you would, and you draw reasonable inferences, then you look at the complaint and tell. How can that be so? How can it be the case that you're to ask yourself, look, which of these inferences is more plausible, and at the very same time say to yourself, I've got to draw every inference in favor of the plaintiff? How is that logically possible? Well, it's the movement that the Supreme Court gives us for analyzing this with respect to we're still under 12b-6, and then you take everything collectively and holistically, and then you look at, okay, what are the non-fraudulent inferences that can arise from the complaint, and they must arise from the complaint, and then the court does a balancing at that point. What we allege here in the first instance is that the court didn't draw any inferences in our favor on any of the issues that we raised. Now, I'll address, Your Honor, the tone at the top. What you've got to claim here is a little more because of the PSLRA. Correct. You have to plead with particularity facts to give rise to a strong, that is, a powerful or cogent inference, and that cogent, strong inference, the allegations must be not only cogent, but at least as compelling as any opposing inference of non-fraudulent intent. Correct. That's it? I'm not saying it's not a high standing. What I'm saying is... And for the corporate scienter, don't you have to plead that there's at least some employee or employees that had the requisite scienter? Correct, and I think we do that here by pointing to the restatement and looking at... No, no. Who's the employee? In the corporate scienter, every circuit court that has addressed this says we don't have to identify the specific individual corporate entity. To get into Judge Jordan's original point, that sounds like a concession on the individual scienter issue. It's not. Then please respond to Judge Ambrose's question then. Where is the individual scienter? I was eager to hear your response to his question, and instead you pivoted to the corporate scienter issue. I apologize, and I'm happy to discuss it. When we look at what the restatement and the complaints say about the tone at the top, the very first sentence they're talking about with respect to the control environment is that it was an inappropriate tone at the top with respect to how Hertz complied with their accounting obligations. So what they're talking is the defendant created... I'm specifically referencing defendant Frasore here because they identify him as what I would say the main culprit here. They say he had this tone. It was respect to accounting issues. He created an operating environment that was very pressurized. Meet the numbers, right? Yes. That happens every day. He put a lot of pressure on them to meet... And they set in targets, and he said, you better hit these targets or else. But there's a difference here. It's not like a case where he's exhorting salespeople to meet their revenue numbers. The complaint, and I'll point the court in the joint appendix. Again, it's in 73, but in the joint appendix, pages 708 through 710, where the restatement goes item by item on 15 different accounting manipulations that occurred. And for each one of those 15 restatements over and over again, inappropriate tone at the top contributed to this. So we're saying... Inappropriate tone. Inappropriate tone. There's never a statement that people were directed to do something that was unlawful or to be fraudulent in the way they addressed the numbers. Was there? Well, what we're saying here is if you look at the specific accounting manipulation that took place and you look at the fact that there was a tone placed on that specific. We're talking allowance for doubtful accounts, for example. It says inappropriate tone at the top played an issue here. So what's the inference we draw from that? It's not that, oh, do better, make better sales numbers. It's change the numbers to meet my concern. Isn't that more of a Kapoor problem than a Fasore problem? I'm sorry? Isn't that more of a Kapoor problem than a Fasore problem? Well, not necessarily. If the company's identifying... Well, isn't that his... I think it's all three, but it's certainly with respect to the two accounting people, yes. The company very specifically identified Fasore as the main culprit of the tone at the top. So when you look at the tone at the top, and again, when I say inappropriate, inappropriate is not a word we came up with. It's not like we had a confidential witness who drew... Yeah, we know that's not your word, but you want to make that word fraud. And that's why I started by asking you, is there a difference between error, mistake, impropriety, and fraud? I think when you balance the allegations of recklessness versus the allegations of mismanagement, if it's a tie, it's my position there's nothing in the complaint that says anything about mismanagement. But under TELEVS, if it's a tie, tie goes to the plaintiff. That's what TELEVS says. And we lay out a very strong case of recklessness here with respect to the tone at the top impacting accounting issues. Then you have very widespread... What makes this a tie? Well, I'm saying at a minimum. What makes it a tie? Don't give me a conclusion. What makes it a tie? Well, the tie is if you look at the allegations in the complaint, draw the inferences in our favor, there's nothing in the restatement itself or the complaint that says anything about mismanagement. Going back to what we talked about before, the PSLRA says you have to have a strong inference that the defendant acted with a required state of mind. Correct. And it's our opinion when you look at the accounting manipulations, you look at the tone pressed and the definition of what actually is recklessness. It's an extreme departure from the created or pressurized operating environment that increased the risk that financial manipulations could occur. And what happened, those manipulations actually occurred. And in every single instance, it increased... Let me ask you a question. You point in the complaint to the fact that there was a change in leadership at the top as evidence that there was C enter. Yes. What would be the practical effect of a ruling that changing management when there's been an inappropriate tone is actually proof of C enter? Well, I think you have to look at the context of the case here. I'm asking you a specific question. What is that signal? What does that tell the public and the markets that if you change your leadership when you think they've been out of line, you may be liable because there may be C enter? Well, I think the resignation in the context of the allegations here suggests that there was, at minimum, recklessness with respect to how they managed their company. And again, with respect to PSLRA, he resigned abruptly. There was no successor in place. And it was right in the middle of the investigation. Now, defendants argued that for sort of resignation was only related to personal reasons. The court rejected that out of hand. But where do you allege that anyone knew or recklessly disregarded the risk that the statements they put out, especially in connection with the 10K in 2014, were anything other than negligent? Or somebody wasn't doing a good job? Where do you get the idea that the strong inference that they either intended or were so reckless that they just completely disregarded? Well, I think it goes back to the point I made earlier with respect to the tone at the top. As the main argument with respect to they're pressuring people with respect to accounting entries. Hundreds of corporations in America have bad tones at the top. Correct. So they're not necessarily a violator of the PSLRA, are they? No. But when the tone at the top is inappropriate and it is directly related to accounting manipulations to the tune of $132 million and three years' worth of financial statements that are deemed to be false and misleading to investors, I think when you look at all of the allegations at the whole, when you look at the tone at the top, you look at the resignations, you look at the massive internal control problems we have here that allow this. Does the amount of money you pointed to, the amount of money, need to be put in context of the overall earnings? Well, yes, and it certainly is. And if you put that in the context of the overall earnings, if you take that number and you cite it and you look at three years' worth of gross revenue for Hertz, what's the percentage of that? Well, I wouldn't look at it in terms of gross revenues. I think that's a red herring. We're looking in terms of the income that they derived, and that's $132 million worth of income that shouldn't have been reported. Then look at it in the context you want to look at it in. What's the percentage? It ranges from, at the highest, it was 32 percent overstatement. Where does that 32 percent figure come from, by the way? In the complaint. In the complaint. Where does the figure come from? I think that's from year 2012, and when we looked at the complaint, we looked at how many years. I couldn't find it. It's how they overstated. It ranged from 14 percent to 32 percent of how they overstated their income year per year. What you're being asked is where did you get the number from? Where did you get the number from? 32.12 percent. I'll tell you what, I'll give you, when you come back on rebuttal, why don't we see if you can give us that source of that. Okay. Thank you. Thank you. Mr. Unikowsky. Good morning, Your Honors. May it please the Court, my name is Adam Unikowsky, and I'm here on behalf of the defendant at Billy's Footes, as well as Mr. Frisora and Ms. Douglas. The District Court carefully applied the stringent pleading standard of the Private Securities Litigation Reform Act and correctly concluded that plaintiffs had not pleaded to particularize facts, giving rise to the requisite strong inference of scienter. We therefore ask the Court to affirm the District Court's judgment. So it's that emotional dissonance plaintiffs bore the burden of pleading to particularize facts, giving rise to a strong, I'm sorry, Your Honor. Why don't you start by dealing with the standard that we have to do. You're starting to recite it, but you've heard your opposing counsel say, we were entitled to have every inference drawn in our favor under 12b-6. Is that an accurate statement? We respectfully disagree with that, Your Honor. I just don't think that's consistent with the PSLRA. What does TELAB say? TELAB says that the PSLRA requires a comparative inquiry that you don't usually get under ordinary pleading. So it's not enough just to show that it's plausible that there's scienter. First of all, there has to be a cogent inference, and moreover, that inference has to be compared with the non-culpable inference. So even if, under TELAB, the standard is that even if there's a plausible theory of fraud, and we don't actually think there is in this case, but even if that did exist, if the inference of a non-culpable inference is stronger, then the plaintiff hasn't stated a claim under the PSLRA, even if the plaintiff might have stated the claim under a different pleading standard. Do you agree with the plaintiffs that a tie goes to the runner, a tie goes to the plaintiff? Yes. So it's true that in TELABs that the court did indicate that if the inference was equal on both sides, then the case could proceed. I think that's an accurate statement of what TELABs holds, but we think in this case the district court's analysis was correct. First of all, I don't think that there are particularized allegations that even get to the threshold in TELABs of a cogent inference of scienter. And second of all, even if plaintiffs couldn't meet that threshold, I think that the non-culpable inference is stronger. How about the assertions that they make repeatedly that this was not merely an aggressive CEO setting stretch targets and putting pressure on people to meet their sales and revenue goals. This was pressure put on accounting people to help meet the numbers, and that that necessarily was going to lead to accounting errors and lead to accounting fraud. Especially when there was all kinds of evidence that the financials were suspect. Well, first of all, to address both those questions, first of all, they're tied. Yes, Your Honor. I think that the flaw in Plaintiff's allegations is that they focus heavily on this retrospective determination in an internal investigation, that there's inappropriate tone at the top. But you can't plead fraud by hindsight under the PSLRA, and there really are no allegations that at the time the statements were uttered, the persons responsible for those statements had the requisite scienter. Well, I'm sure Mr. Willans will say it better than I am about to, but I understand their argument to be, no, we in fact have said that when the CEO tells people who are responsible for putting the numbers together, you better make the numbers, you had better make the numbers. And it communicates effectively, your job is on the line if the numbers don't come out right. That it doesn't take a written memo about fraudulent accounting practices to communicate to them, I want to see these numbers and I don't care how you get there. That's what I take them to be arguing. What's wrong with their argument? Well, there's no specific allegations that the CEO said anything like that. There's just these nonspecific statements of putting pressure on people, and I think that most corporations in America have a pressurized operating environment to some extent. In this case, after the fact, there's an investigation that deemed the operating environment to be inappropriate, but I don't think it's fraud for the CEO to put pressure on people, even if after the fact the company deems it inappropriate. And just to add on to that, it's not as, I'm sorry. Is it inappropriate to put pressure on accounting people? Again, their argument is, this was pressure on the numbers people, not on the people in the field producing. This is not on the Hertz sales reps or the Hertz line employees to try to upsell. This is pressure on accounting people. People in the executive suite. I don't think that just alleging just general pressure on accounting people is enough to state a claim under the PSLRA. The case might be different if there was a specific allegation that on such and such date, the CEO told such and such accounting person, you better manipulate those numbers. I don't care what's going on at the company. Manipulate those numbers until we get to our financials. Or some specific thing directing the person to commit fraud. But there's nothing like that here. It's just a general, non-specific statement. Even if the allegations fail to plead anyone else, don't they raise a stronger inference as to Ms. Douglas, who's the CPA? I don't think that the inference with regard to Ms. Douglas is strong at all, Your Honor. First of all, there's really nothing specific. She's the one who's got to be, you know, nose from 10,000 feet and down in the weeds what's going on with the financials. Yeah, but there's no actual specific allegations about her at all in the complaint. The restatement talks about Mr. Fasora, and then those allegations are repeated in the complaint. But the restatement says nothing specific about Ms. Douglas, and nothing in the complaint refers to her. So I don't think there's a particularized allegation to prescient her. What about the implication, though? Can't we draw something from the fact that on the COSO factors they were deficient in four out of five categories? That's a pretty widespread failure, isn't it? Yeah, I would agree with that, that the internal investigation demonstrated some failures in the company. But, again, I think that there's a hindsight problem there. And I just want to make one other point about this, which is that it's not as though the restatement says there was inappropriate tone at the top, and therefore there were accounting errors. Actually, as the district court explained, the restatement is considerably more measured than that. It says that there were, in certain instances, an inconsistent and sometimes inappropriate tone at the top, and that there was a conjunction between that and lots of other factors, things like multiple conflicting business initiatives and legacy systems and personnel who weren't knowledgeable or experienced. Well, when you say conjunction, you're not implying that this was coincidence. I mean, there was a causal line drawn between the inappropriate tone and the accounting errors, wasn't there? Yeah, well, I think that the precise causal line was between a complex mix of structural environmental factors, including sometimes inappropriate tone at the top, which may have led, and other things. And I think what's important is that that has to be framed next to the standard for recklessness. So the question for recklessness is whether it was actually known or is it so obvious that it must have been known that there was a risk of misleading statements. And I don't think that there are any allegations in this complaint to suggest that it was so obvious that it must have been known that there's this tone at the top in conjunction with all these other things, that there's no allegations that the people at the top were aware of. So someone ironically seemed to be arguing because the mismanagement was so rampant and pervasive that it helps you when it comes to fraud. Well, I mean, I'm not sure I would precisely frame it in those terms, but I don't think that... Well, I mean, you know, you get 15 points to cite, right? Look, it's not just tone at the top, it's not a direct order saying cook the books, it's all of these problems and the confluence of all these problems led to the restatement. Is that fair? Yeah, I think that is fair. And plaintiffs have not alleged that anyone, any individual defendant, defendant, excuse me, anyone at the top of the company was aware of all these other factors that might have led to these problems. There's no allegations of that nature. And so what the restatement says, which plaintiffs rely upon, is that all these factors together led to these problems at the company and it's just unaccompanied by any allegation that it was so obvious that it must have been known to senior management that you'd have this confluence of factors. Can I ask you about the trading plan? Yes. A specific question about some of the insider trading stuff. You've asserted that the existence of the 10b-5-1 trading plans means there's, you know, there's no fire here, there's not even really smoke. Do you have any, is there anything in the record we can look at showing when those plans were entered into? And if there isn't, why does their existence mean anything since we don't know when they happened? Well, let me just say two things about that. First of all, this report said and we agree that that's not necessary for our case. We believe that even without... Well, let me just ask you... Let me answer your question directly. So plaintiffs have urged a very serious allegation of insider trading. And plaintiffs base that allegation entirely on these Form 4s. But if you look at the Form 4, you've got the line about the trade and then on the very next line... You can go ahead and give an explanation if you want. But the question I was asking, and I'd like you to answer that is, is there anything in the record that shows when the 10b-5-1 plans were entered into? No, there is nothing in the record. Okay. And if there is nothing in the record that shows when they were entered into, how can they be of help to you since conceivably if you accept their lie of argument, those plans were entered into in the midst of the fraud? I think that the Form 4s are... Because they mentioned the 10b-5-1 trading plan implicitly, I think they're saying that the 10b-5-1 trading plan wasn't entered at a time where there was awareness that the stock would plummet. In other words, I don't think they could have put that on the Form 4 if it wasn't entered in good faith. And it seems to me that if plaintiffs are relying on the Form 4, I mean, they're essentially saying that we trust the top line on the Form 4 that says that there's these trades, but we're going to mistrust the very next line that says there's this plan because plaintiffs speculate that it was entered into into bad faith. But it seems to me that if the PSLA requires the weighing of inferences, it's very hard to say we're going to take one part of this document and ignore or assume the worst about the next part of this document. And so it just seems to me that the weighing of inferences requires the court to take the whole document. I mean, it's true there's nothing in the record, correct, Your Honor, about the exact facts of these 10b-5-1 trading plans. Certainly, there's no particularized allegations from plaintiffs that there's anything fraudulent about these plans. It's really just speculation on their part. Let me go back to Ms. Douglas. You said that she was a CPA and that might raise a stronger inference than for others as to what was going on. But also, isn't that inference bolstered by the large amount of stocks that she sold in 2013? I don't think so, Your Honor. First of all, I mean, setting aside the fact that all of her trades were pursuant to these plans, and I acknowledge that there's no details on that 10b-5-1 plan, all those trades were very early in the class period. I think they were all in May 2013, you know, long before the bad news started to come out. Also, the stock price kept going up, up, up after that. What was the class period? I think it was February of 13 to July of 15, and I think that's right. Plaintiffs will certainly correct me if I'm wrong about that. But the trades were very early. I think that the last of Ms. Douglas' trades that cited in the complaint is from May of 13, I believe. And the stock price kept going up, up, up until August of 2014. And so I just don't think that the proximity of these trades to the bad news really raised a very strong inference of anything, even setting aside the 10b-5-1 issue. And the other thing is Mr. Forsoy didn't actually trade any stock during this period, even though he is the one who – Her last trade was 12-31 of 13. She had 4-15, 5-8, 5-15. I'm sorry. That was Mr. Kapoor. Yes, I'm sorry. Ms. Douglas had the one trade in December of 13. I'm sorry, Your Honor. But, yes, the other trades were all in 4-5 of 2013. And even 12-13 was before the internal investigation started. The other thing is Mr. Forsoy didn't trade any stock. And there's actually several cases from this Court saying that that kind of fact – I see my red light is on – that that kind of fact lowers the inference of Sienter. All right. So if the Court has no further questions, I'll yield to my colleague. That's a good segue to Mr. Markell. Thank you. Good morning, Your Honor. My name is Gregory Markell. I'm with CIFAR Shaw in New York, and I represent Mr. Kapoor. I would like to address your questions. We've covered our material in the brief. Let me start off by asking you, assuming we cannot take judicial notice or we don't take judicial notice of any trading plan, wasn't the timing and the amount of Mr. Kapoor's trades unusual? No, Your Honor, and there are two reasons. First of all, his trades were all in – the latest was, I believe, May of 2013. The ones before that were March of 2013. Okay? But they were all within a class period, right? They were in a class period. But, Your Honor, a couple of things, and this goes to inferences to draw. There are two or three points I'd like to make on this. The first is, purely with the timing, he resigned more than a year later, about a year later, in April of 2014. The first hint that there might be problems in the accounting, according to the complaint, and I think it's too early, is in the fall of 2013. There's no hint of any restatement until mid-2014, so long after his trades and under the case law. But there's another important point, Your Honor, and plaintiffs have tried to obscure it in their brief. I'm not criticizing them personally, but I believe they're trying to obscure it. In terms of Mr. Kapoor's investment of his money, cash, his investment actually went up in the class period. What he did in addition to that was to exercise options and sell immediately at the same day, so that their sales are actually, they are sales, there are cases that talk about them being treated as sales, because he bought and sold simultaneously. But he actually increased the amount of money, his personal money, during the class period that he invested in the stock. So he did not, and you'll find in many of the cases which rely on stock sales, he did not divest himself of his main investment. But he made $3.1 million in the space of a few months during the class period, right? That is correct, Your Honor. He made, what, $3.9 million, didn't he? Excuse me? The profit was $3.9 million, wasn't it? I believe the number is $3.9, but it's in the threes, yes. Would you answer the point raised by Judge Hardiman a few minutes ago? Mr. Kapoor was the person who sort of had line authority, didn't he, dealing with a lot of these accounting issues? So, Your Honor, actually, there are a couple of points. First, he did not report to Mr. Frazzura. He reported to Ms. Douglas. And there are no allegations that he, using the PSRA standard, that no allegation was pressed. Let me ask more specifically. Did he make the line decisions? It is my understanding that he was more a person who had a staff of people who dealt with accounting issues. Great. On a theoretical level, and he was not in the line of implementing the accounting. That's my understanding. Wasn't he a guy who should have known if there were actually diffuse and pervasive accounting problems? Somebody who should have known? Well, Your Honor, the answer to that is, I think, in large part, The answer is, he might have known that there were problems. He certainly would not agree that he would know that there was fraud here. First of all, I don't think there was any fraud. And second, I believe he did not have any knowledge of fraud. I'm not asking you to own up to the fraud word. Obviously, you can't do that at the lectern. But I am asking the question. Since the argument is being made by the defense, it can't really be the inappropriate tone at the top. Because look, we were messing up all over the place. That's kind of the pitch. It's so diffuse. The problems are rampant. If they're diffuse and rampant, isn't Mr. Kapoor the person who of this group would maybe be the first person to know, hey, there's diffuse and rampant problems in the accounting? I don't think that he would be the first person to know. Was he aware of some problems with the accounting? Quite possibly. But do I think he knew there were all these problems? No, I don't. And to this day, I don't think he agrees with some of the restatements. So he doesn't view them as accounting problems. But, yes, was he aware of some problems? He could have been. All right. Thank you. Thank you. I hope that answers your question. We'll get Mr. Willis up then. Thank you very much. Thank you. I apologize for the rustling that was going on behind. No, no problem. With respect to the 32%, that comes from Paragraph 135 of the complaint. And then with respect to where we got that number from, there's accounting information that's laid out in Paragraphs 301 to 314 that lays out the restatements as they go. A lot of that's numbers that the company provided. And then with the assistance of our forensic accountants, we then looked at the numbers and came up with the percentages that you find in Paragraph 135. So we have the restatement. I'm not the accountant. I didn't do the math myself. But that's where it essentially comes from. Can I go back, almost circle back to where we were at the beginning? I asked you a question, or Judge Gordon denied, and he did. And you wanted to start with Corporate Center. Yes. And if there are deficiencies with regard to the Fourth Amendment complaints, CENTER allegations, do we have any need to get to Corporate CENTER? No. And let me just say, the reason why I wanted to start with Corporate CENTER. Which is why Judge Gordon immediately asked his question, are you conceding that there's a problem? No. With respect to Corporate CENTER as a whole, if you find CENTER with respect to any of the individual defendants, that's good enough to impute CENTER to the company. My goal, and maybe now it looks like not so great to start off with, was just to emphasize to the court that what the district court didn't find here and largely ignored was there was an accounting fraud. It was perpetrated by someone. Now, do we have the link between the individual defendants... Who said there was accounting fraud? Well, again, that's the inference that we're asking the court to draw from the allegations of the specific manipulations that were... And I think there's a big gap between fraud and failure of internal controls, isn't there? Yes, but... In some way, and maybe I'm misreading this, but when I read lack of internal controls, that bespeaks sloppiness, lack of due care. It bespeaks the kind of mismanagement that the district court cited as opposed to bespeaking fraud. That's why I wanted to talk about not necessarily the internal control problems. The issue with the internal control problems are that's what allowed the cover-up to happen for the three years of the financial statement. The company very specifically says in the restatement that those employees failed to disclose the changes in accounting methodologies that were made. And, again, I direct your attention in the joint appendix, page 708 to 710, where the company lies out very specifically the types of errors that were made here. And what they say is there were allowances for doubtful accounts, for example. There were assumptions that were made by the accounting people that had no support. There were allowances for doubtful accounts. That sounds like Pollyannish optimism, not fraud. Every business that's got people that are past whatever, 90 days, hopes that they're still going to collect on those, right? That's not fraud. But what it is is it's an account that's subject to easy manipulation, and what these employees below did is they manipulated it. And they manipulated it in a way that if you look across the 15 different items that we talk about here, every single one resulted in an increase in net income. If these were errors, that completely undercuts any inference that this was a result of negligence or mistakes. Because if it was, you'd have a mixed bag. If there were mistakes, some would increase net income, some would decrease. But here, every single one worked to increase net income during the class period. So when you look with respect to errors or manipulations that were consistent across all 15, it's not the judge said they were diffused, but you have the same errors occurring over and over again in these very easily manipulated entries, and they all work in the same way. The inference that we're asking the court to draw is that was accounting fraud. Now, if I could just make one last statement, and I know my time's up, this restatement was written while our case was pending. So what happens here when they come up with the inappropriate tone at the top language and the inappropriate, they knew we were waiting for these results. They had every incentive to put the company in the best light, and the best they can do under those circumstances was say these were inappropriate decisions that were made. These were inappropriate actions conducted. They could have said negligence. They could have very expressly said mismanagement, and they didn't do so. So it's a direct line from inappropriate to fraud in the plaintiff's mind. I think when you look at how a reasonable person, and that's what TELEB says is you come at this from a reasonable person standard, a reasonable person would see the word inappropriate and connote that there's some wrongfulness here, and that's the inference we're asking the court to draw. Thank you. Thank you very much. Thank you to all counsel. And we'll take the matter under advisement and call our session.